UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEJANAI RASKA,

     Plaintiff,

v.

DETROIT PISTONS ORGANIZATION
and ROBERT MURPHY,
jointly and severally,

     Defendants.

Case No.
Hon.

---

PITT MCGEHEE PALMER BONANNI & RIVERS, P.C.
Megan A. Bonanni (P52079)
Danielle Y. Canepa (P82237)
Michael L. Pitt (P24429)
Attorneys for Plaintiff
117 W. Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800
mbonanni@pittlawpc.com
dcanepa@pittlawpc.com
mpitt@pittlawpc.com

---

## COMPLAINT AND JURY DEMAND

Throughout DeJanai Raska's employment with the Detroit Pistons, her supervisor Rob Murphy, now Assistant General Manager of the Pistons, sexually harassed and brutally assaulted her. Ms. Raska's experience with Murphy and the Pistons Organization is an unfortunate but all too familiar story of the ongoing inability of professional athletic organizations to provide a safe workplace for women.

When Ms. Raska was hired in September 2021, Murphy held the position of Pistons Senior Player Liaison and had just assumed responsibility for Detroit's minor

league team, the Motor City Cruise, as General Manager & President. Murphy convinced Ms. Raska, a 32-year-old professional, to take an entry level position with assurances of career opportunities in a field she loved.

Ms. Raska endured unrelenting harassment by Murphy, ranging from sexual comments about her body, to flaunting of his alleged sexual proclivity and past conquests, to pointing at his erect penis and telling Raska that "she did this to him." Feeling insulated by his status and power, Murphy repeatedly pressured Raska to engage in a sexual relationship with him, referring to her as "wife material" and promising professional and personal advancement if she acquiesced to his demands. Murphy groped and grabbed her buttocks and breasts, declaring "this is gonna be all mine," and announced he wanted to put a baby inside of her.  On one occasion, Murphy forced himself on top of Ms. Raska, held her down, and when she tried to pull away, he told her, "You need to get out of your head. You think too much."

Ms. Raska consistently and unequivocally rejected Murphy's sexual advances, employing tactics to discourage him and avoid future harassment. Murphy groomed Raska, periodically apologizing for his improper conduct and resuming the role of mentor and professional advisor, sometimes for weeks at a time.  On other occasions, Murphy's response to Raska's refusal of his sexual advances was hostile; he degraded and demeaned her, telling her that no one in management approved of her hiring because she was "ghetto." Murphy warned Ms. Raska that if she complained to Human Resources, she would not be believed because of his tight relationship with its Director. In response, Raska told herself she would not let a man interfere with

her opportunity to work for the Pistons, an organization and a sport that she deeply loved.

Murphy retaliated against Ms. Raska for refusing to have a sexual relationship with him. Murphy conditioned Raska's role and her assignments on agreeing to a sexual relationship. Instead of allowing her to perform the normal duties of an executive assistant, Murphy tasked Ms. Raska with picking up his son up from school and caring for him, duties that required her to leave the office in early afternoon, isolating Raska from her peers and Pistons Management.

Ms. Raska's employment relationship with the Pistons Organization ended because of her refusal to submit to Murphy's demands for a sexual relationship and his campaign of retaliation, which made working there impossible. Her last official date of employment was June 3, 2022.

Once she was safe from Mr. Murphy, Ms. Raska formally reported the sexual harassment and retaliation she endured to the Pistons' Organization in order to protect other women and help the Organization. The Pistons interviewed Raska in detail. The Pistons then retained Mr. Murphy and took no further action for over six months until they received notice of the risk of this lawsuit. Their seemingly indifferent response has proved Ms. Raska's original instincts correct—that the Organization tolerates and enables a sexually hostile workplace.

As a result of the conduct by Murphy and the Pistons, Raska lost her job, suffered significant emotional impact, and lost a once in a lifetime professional opportunity to build a career in the sport that she loved.

Raska brings this action against Defendants Detroit Pistons Organization ("the Pistons") and Robert Murphy ("Murphy"), for Sex and Gender Discrimination, Sexual Harassment, and Retaliation in violation of Title VII of the 1964 Civil Rights Act ("Title VII") 42 USC 2000e et seq. and the Michigan Elliott-Larsen Civil Rights Act ("ELCRA"), MCL § 37.2101, et seq., and assault and battery under Michigan common law. She states as follows:

<u>Jurisdiction and Venue</u>

1. This Court has subject matter jurisdiction over Raska's federal claims pursuant to 28 USC 1331 and 42 USC 2000e et seq.

2. This Court also has supplemental jurisdiction under 28 USC § 1367 to address Raska's claims brought under the Elliott-Larsen Civil Rights Act, ("ELCRA") MCL 37.2101 et seq. and Michigan common law because they form part of the same case or controversy.

3. The events giving rise to this action occurred in Wayne County, Michigan.

4. Venue is proper in the Eastern District of Michigan because the events giving rise to this cause of action occurred in this district and all parties reside and/or operate within this judicial district.

<u>The Parties</u>

5. Plaintiff DeJanai Raska is a professional who began her career as a real estate agent and then as a project manager for athletes and musicians. At all relevant times during her employment with the Pistons, she was 31 years old. With friends

4

and colleagues, she goes by "DeJanai" or "DJay." Raska has a daughter who was four or five years old during the events detailed here.

6. Defendant Pistons Organization operates Detroit's major-league professional basketball team, the Detroit Pistons. The Pistons compete in the Eastern Conference of the National Basketball Association (NBA).

7. The Motor City Cruise are the NBA minor league team based in Detroit. The NBA minor league is known as the G League. The Detroit Pistons Organization wholly owns and operates the Motor City Cruise.

8. Defendant Rob Murphy is the former Assistant General Manager for the Detroit Pistons. He was promoted to that role in June 2022.

9. During the period of Raska's employment, Murphy was the Senior Player Liaison for the Pistons and the General Manager & President of the Motor City Cruise.

10. In August 2021, prior to Raska's employment with the Pistons, Raska worked in real estate, managed amateur basketball players, and worked as a project manager for musical artists in Detroit. Raska wanted to move into sports management full time.

### Murphy Directs HR to Hire Raska Outside of Its Normal Process

11. A mutual friend introduced Raska to Murphy so that Raska could pitch one of her players to try out for the Motor City Cruise team.

12. Murphy called Raska and told her, "I looked at your Instagram. You sound very serious about basketball. You seem connected to the city. I'm looking for

an executive assistant right now." Raska turned down the job offer, explaining that she was happy and busy with her current work. She was a real estate agent, she managed events for hip hop artists, and she managed several amateur basketball players.

13.     Murphy invited her to visit the Pistons office to meet in person. Once there, Murphy encouraged her to embrace the professional opportunity to work with the Pistons organization.

14.     Murphy invited her for a second interview and then offered her the job.

15.     Unbeknownst to Raska, the executive assistant position had already been filled by Nicolet Lewis, Senior Vice President Human Resources for the Pistons. Murphy rejected Lewis's selection and instructed Lewis to on-board Raska instead, bypassing the typical HR process. Raska did not learn that Murphy had forced HR to hire her outside of its normal process until after she started the job.

### Murphy Hires Raska as his Sexual Target, Not as an Executive Assistant

16.     On September 2, 2021, Raska began her employment as Executive Assistant to Rob Murphy. Under the terms of the contract, Raska was employed by the Detroit Pistons Basketball Company as the Executive Assistant to the President and General Manager of the Motor City Cruise, operated by the Detroit Pistons.

17.     Under the terms of the contract, Raska's duties as an executive assistant role were the "duties and services consistent with the position of Executive Assistant to the President and General Manager of the Motor City Cruise" as may be assigned to her by the NBA and the Motor City Cruise. The contract further provided that

6

those duties "shall include" assisting in Murphy's "administrative duties and operations" related to the Motor City Cruise during the season, pre-season and postseason (including any post-season tours or tournaments), "attending all meetings of [G]-League[1] personnel as requested," "coordinating duties related to player drafts and other player personnel decisions and operations as requested by the League or the Basketball Team," "assisting with day-to-day duties of the President and General Manager," and making herself available for marketing and promotional appearances on behalf of the team and the NBA.

18.     Yet Murphy never directed or allowed Raska to perform the job of an executive assistant. At no time did Murphy allow, train, or instruct Raska to perform the full duties that he hired her for.

19.     When Raska started, Murphy limited Raska's assigned work to occasional scheduling and administrative tasks. A few weeks into the job, Murphy asked Raska to pick up his 14-year-old son from high school and drop him off at Murphy's house. Raska agreed. Murphy continued to ask Raska to pick up his son. Driving and babysitting Murphy's son soon became one of Raska's only job duties.

20.     Raska initially believed that if she performed these initial tasks well, Murphy would allow her to perform the full duties of an executive assistant.

21.     Raska wanted to be helpful in any way that she could because 2021–2022 was the inaugural season for the Motor City Cruise. Both the team and

---

[1] The NBA minor league, formerly known as the D-League, became the G-League in 2018 as part of a promotional partnership with Gatorade.

7

Murphy's role were new. Raska assumed that her job duties would evolve as Murphy grew into his role. She believed that the childcare was a temporary placeholder for her formal job duties.

22.     But ultimately, Murphy distributed most of the "administrative duties and operations" described in Raska's contract to other staff. Murphy only allowed Raska to send him a summary of his schedule, perform discrete scheduling tasks, process some reimbursements, and attend a weekly internal team meeting. Other staff handled Murphy's scheduling, flights and transportation, email communications, and billing.

23.     When Raska began to ask for executive assistant work, Murphy announced to Raska that he didn't think she was capable of performing the duties of an executive assistant, despite her professional experience and his own decision to hire her for the executive assistant role. He intentionally intimidated and belittled her: "You wouldn't get it," "The stuff that you did before was ghetto shit."

24.     Other than sitting in on a single weekly internal team meeting, Murphy never directed Raska to attend or perform duties related to "meetings of [G]-League personnel," as described in her contract.

25.     Murphy never assigned Raska a single task related to "coordinating duties related to player drafts and other player personnel decisions and operations as requested by the League or the Basketball Team," as described in her contract.

26.     The only event Murphy ever allowed Raska to work on was a personal Christmas event for the Rob Murphy Foundation.

27.     Shortly after hiring Raska, Murphy began directing unwelcome sexual comments at Raska.  He told her she was "wife material" and told her she was beautiful. She brushed off these initial comments.

28.     When Raska continued to ask for real work as an executive assistant, Murphy belittled and humiliated her. On one occasion, Murphy walked Raska over to the employee that Murphy assigned to book his flights. Murphy said, "DJay thinks she can do your job." He created confrontation and humiliated Raska in front of a colleague instead of giving her the responsibilities he had claimed to hire her for.

29.     In early November 2021, Murphy made explicit comments about Raska's body at work. She was wearing a suit that she had worn regularly for four or five years as a real estate agent. Murphy approached Raska and tried to flirt with her by stating: "DJay, you can't be coming in the office . . . a lot of these white girls don't have those curves. You gotta watch what you wear. You can't be having that thing stick out. There's men that work around here. I don't want anybody in here paying attention to that." Murphy was not reprimanding Raska; he was using the suit as an opportunity to sexualize her.

30.     This happened on multiple occasions. Raska thereafter attempted to discourage and avoid this harassment by wearing athleticwear to cover up her body. The Pistons allowed athleticwear as professional dress at the office.

31.     Raska continued to drive Murphy's son home from school and help with household errands. Several times, Murphy asked her to stay overnight with his son

while he was out of town. Raska sometimes volunteered to assist with laundry at the Pistons facility because Murphy refused to give her work as his executive assistant.

32.     Throughout these months, Raska continued to ask Murphy to give her the real work that she was hired to do as an executive assistant. At each turn, Murphy told Raska that she was not capable of performing more professional job duties. He told her, "I know you haven't been in an office setting before," despite Raska's years of experience as an executive assistant and project manager.

33.     Murphy would tell her, "I'm just trying to help you. All you gotta do is sit at your desk." She told him she was 32 years old and did not need that type of "help."

34.     On one occasion, Raska left a meeting with Laronda Burley (VP for the Motor City Cruise) early and stated that she was going to pick up Murphy's son. When Murphy heard this, he told Raska not to tell anyone else that she was picking up his son every day from school. Murphy warned her about "liability."

35.     In fact, Murphy relied almost exclusively on Pistons staff to pick up his son from school.

### Murphy Sexually Assaults Raska

36.     In or around November 2021, Murphy sexually harassed and physically assaulted Raska.  That day she was dropping Murphy's son off at his house. Raska had her four-year-old daughter with her. As she was leaving, Murphy grabbed Raska's breast and said, "This is gonna be all mine." He moved his hand to her genitals and said, "This is gonna be all mine too." She pushed him away. She told

10

him: "Rob, don't ever touch me like that." She also expressed shock that he would touch her or assault her in front of her daughter. She left the house immediately.

37.     Raska continued to act in a professional manner towards Murphy, hoping that he would leave her alone in light of her clear objection to his actions. Still, she remained on guard.

38.     Shortly after that, in or around November 2021, Raska rode with Murphy in his car to attend a Motor City Cruise game. Out of the blue, Murphy said to Raska, "Do you like sucking dick? Do you wanna suck my dick?" She declined, commenting that she does not do that. Murphy persisted, despite her attempt to deflect the comment. He berated and humiliated her by commenting that he felt sorry for the men she had been in relationships with.

39.     Murphy began grabbing Raska's body at the office at the Pistons Practice Facility (PPC). Raska repeatedly told Murphy, "I want to keep our relationship strictly business." Murphy would respond, "OK, I'm gonna back off. That's all you gotta say."

40.     Murphy's sexual harassment was episodic. When Raska told him to stop, he would stop for a few weeks. During those times, Raska felt hopeful that they could salvage a professional relationship. But then Murphy would return to harassing her again.

41.     During the period from October 2021 to May 2022, despite Raska's protests, Murphy engaged in a series of sexually inappropriate acts, including but not limited to the following:

a. On multiple occasions, when they were alone in his office, Murphy stood up from his desk and showed Raska that his penis was hard. He would tell Raska that she did this to him. He showed Raska that his penis was hard again on at least on occasion when she dropped his son off at home.

b. Murphy explicitly conditioned professional duties (including the very job duties she was hired to perform) and opportunities on her willingness to engage in sex.  For example, Murphy proposed that Raska could travel with the team if she would sleep with him, but, "If you're not ready for that, you're not ready for travel."

c. Because Murphy was one of the most senior members of the Pistons organization, only a small number of people had access to the same areas of the building. Murphy used these areas to touch and comment on Raska's body without her consent and without anyone nearby to see or intervene. Murphy frequently did this on the stairwell near the secured elevators for the first to third floors of the building.

d. At the office, Murphy would gesture for her to walk ahead of him as if he was being polite, and then grab her behind and her legs when she walked in front of him.

e. If Murphy was at home when Raska dropped his son off, Murphy would try to delay Raska from leaving. Murphy would try to touch Raska and say, "I see how good you are with my son.  You're wife material. How much is your rent? You can move in here. You know how bad I want

you." As with every sexual advance, Raska declined and abruptly ended the conversation.

f.  Murphy would look at Raska's body and say, "Ooh, DJ," making it clear that he was checking her out.

g.  Murphy repeatedly pressured Raska to enter into a sexual relationship with him, which Raska consistently refused.

h.  On one afternoon, while Raska was dropping off his son at home, Murphy telephoned a woman, placed the call on speaker and discussed sex with her while Raska stood there. Murphy hung up and looked at Raska, commenting, "See, I can get this anywhere."

42.  Raska tried to deflect Murphy's behavior every way she could think of—laughing it off, changing the subject, walking away, or telling him explicitly to stop. Sometimes Murphy relented and stopped for a short time, but then he would revert to harassing her again.

43.  Murphy's conduct was confusing and overwhelming. There were times when Murphy acted like a mentor and offered Raska career advice. During these occasions, Raska appreciated his insight and professional guidance. She tried to continue working so that she could benefit from the professional opportunity to work for the Pistons and to learn from a senior executive like Murphy. Raska just wanted to get on with work.

44.     Raska had played basketball throughout her life and loved the sport. She told herself, I'm not going to let this man stand in the way of me working for the Pistons.

### Murphy Assaults Raska Again

45.     In or around November 2021, Murphy asked Raska to stay with his son over the weekend while he was away. But Murphy came back to his house late in the evening while Raska was there. This was the first time that he showed up at night while she was babysitting his son.

46.     Murphy, his son, and Raska chatted. Then Murphy told his son to go to bed. Murphy went into his home office and called Raska to follow him, "DJay, can you come in here for a second?"

47.     When she walked in, Murphy grabbed Raska's behind and kissed her on the mouth. Raska went stiff and pulled away. Then Murphy said, "I wanna put a baby inside you. Do you wanna sneak to my room?" Raska was terrified. She once again tried to deflect, telling Murphy that she was tired as she stepped away from him. Raska went to the guest room and locked the door. She had never stayed the night while he was in the house. Raska was terrified that he would come into her room during the night.

48.     Raska left the house as soon as she woke up the next morning. She left behind piles of donations she was helping to organize for Murphy's personal foundation event. Raska was concerned that Murphy would come back to assault her while she was cleaning up. The next day, he texted, "Where'd you go? My son said you

just left. You left a mess around the house." Raska called her sister. She went back to the house to clean up the donations, but brought her sister so she would not be alone.

49.     Raska was afraid to approach HR to report the harassment because Murphy told her that HR didn't like her. Murphy frequently used the fact that he "got her this job" to try to convince Raska that she owed him, that she was isolated from other employees, and that she was totally dependent on Murphy's approval to avoid being fired. He would tell Raska, "I'm the only one here for you. Nobody else wants you here." The emotional abuse was part of his sexual harassment.

50.     The emotional abuse extended to Murphy's continuing refusal to assign Raska administrative assistant work. Murphy told Raska that no one liked her or respected her because she did not have a four-year college degree. He told her that she was "ghetto" and not capable of serious work, although he never gave her an opportunity to perform the very tasks for which she was hired.

51.     Murphy also led other staff to believe that he was the only reason Raska was hired. For example, Murphy told one colleague, "Nobody wanted DJay here. I'm the only reason she's here."[2]

52.     Multiple members of Pistons staff and management appeared to regard Raska as Murphy's designated sexual target and not as a "real" employee of the company. They accepted and enabled Murphy's ability to hire Raska and keep her on

---

[2] Murphy made this statement to a social media intern. Her name is withheld at this time to protect her privacy.

staff in order to target her sexually while excluding her from the job she was hired to do.

53.     Pistons staff excluded Raska from meetings that would ordinarily include Murphy's assistant. In one instance around January 2022, Nicolet Lewis, the head of Human Resources, held an HR meeting with the entire Motor City Cruise staff—totaling 17 people—except for Raska. Lewis did not invite Raska.

54.     Every other member of staff completed periodic performance reviews. Raska was never invited for a performance review.

55.     Murphy told Raska that Nicolet Lewis did not want Raska around because Raska did not have a four-year college degree. On another occasion Murphy told Raska, "HR doesn't even want you here! We all think you're ghetto!"

<u>Murphy Attempts to Rape Raska</u>

56.     In January 2022, Murphy attempted to rape Raska. Raska only stayed overnight with Murphy's son when Murphy was out of town. In January, Raska was staying the night on that basis. In the middle of the night, she heard the garage door open. She thought someone was breaking into the house. It was Murphy, coming home early from a scouting trip. He tried to chat with Raska and asked how things were going. Raska told him she was tired. She went back to her room and back to sleep. The next morning, Murphy called Raska and his son to come into his room. Then he told his son, "I need to talk to DJay alone." Murphy closed the door behind his son.

57.     Murphy pushed her onto the bed. She went stiff and tried to pull away. He said, "You just need to get out of your head, DJay. You think too much." She said, "Rob, I don't want to do this." He did not stop. He held her down on the bed and said, "You just think too much." Raska was desperate to escape. She told him, "I'm on my period." He stayed on top of her. "It's just a little blood." Raska was terrified and completely disgusted.

58.     She pushed him away and stood up, "I'm not comfortable with this." She sat down on the edge of the bed, feeling defeated and disgusted. She put her head in her hands. He kept talking. She stood up and left.

59.     The next day, Murphy acted like nothing had happened.

60.     After that night, Raska told Murphy she would not watch his son overnight again. Raska entirely stopped going inside the house when she dropped off his son. Murphy's son noticed. Eventually he said, "What did my dad do? Did he hit on you?"

61.     Murphy hired another woman instead, named M.[3] A couple of times, M.'s scheduling fell through and Raska was forced to cover for her. M. was in her early 20s. After a few weeks, she started cancelling last minute and frequently missed work. M. quit the job entirely after a month or two. Raska suspected that M. quit because Murphy was harassing her too.

---

[3] M.'s last name is unknown to the Plaintiff. Her full first name is withheld at this time to protect her privacy.

## Raska Attempts to Transfer and Warns Other Staff About Murphy

62.    In or around February 2022, Raska looked for another role within the Pistons organization. A member of the Pistons Engagement staff referred her to a job opening for a similar role. Raska applied to the open position through the Pistons website and interviewed for the job. Raska emailed HR to notify them that she was applying for the transfer.

63.    Murphy discovered that Raska had interviewed for another role. Murphy was upset and told Raska that she should have told him. Raska did not get the new job.

64.    In February or March 2022, Raska warned three of her young female colleagues about Murphy's harassment.[4] She had initially tried to protect them from knowing about his misconduct but became concerned that he would target them as well.

65.    In or around March 2022, Raska learned that Murphy had had sexual relationships with other women in the office, at least one of whom was director-level. While Raska initially hoped that this executive would mentor her, they were

---

[4] Raska warned a social media intern, a Basketball Operations employee, and the Assistant Equipment Manager for the Motor City Cruise. Their names are withheld at this time to protect their privacy.  All of them were young women in their early 20s. Raska became particularly concerned for the Assistant Equipment Manager when Murphy started asking her to drive his son. Raska warned her that Murphy may sexually harass her or even pressure her for sex.

dismissive. Later, two individuals confided in Raska that Murphy had a sexual relationship with this executive.[5]

66.    Around this time, two other Pistons staff noticed that Raska seemed sad and withdrawn. They asked Raska, "Hey, what's going on with you?" She told them about Murphy's harassment.[6]

67.    Raska avoided attending work in person whenever possible in order to avoid the groping and verbal harassment from Murphy.

68.    The Pistons had actual and/or constructive notice of Murphy' harassing behavior of women at the Pistons, including Raska, but failed to take prompt and adequate remedial action in response and, as a result, enabled and sanctioned Murphy's continued harassment of Raska.

### Murphy Pushes Raska to Her Breaking Point

69.    By April 2022, Raska had consistently refused Murphy's advances and tried to make the best of the opportunity to work for the Pistons. Murphy maintained his refusal to give Raska normal administrative tasks as provided in her contract and likely interfered in her ability to receive a transfer. Murphy continued to demand that Raska sit at a desk all day, with nothing to do except driving his son home from school.

---

[5] The executive was the Senior Director for Basketball Administration for the Pistons. Two individuals separately informed Raska that Murphy had an on-and-off sexual relationship with her. Her name is withheld at this time to protect her privacy.

[6] Raska has this conversation with a scouting coordinator and the Assistant to Troy Weaver, the Pistons General Manager. Their names are withheld at this time to protect their privacy.

70.     In April 2022, Murphy groped Raska in public when she gave him a ride to pick up his car from a car detail shop.  When Raska approached the driver side to get into her car, Murphy grabbed her body and put his hands on her behind. "You just don't understand DJay," he said, "You could have it all. You could have it all." She pulled away and asked him if he was done. She drove away.

71.     At the end of April 2022, when Murphy learned that Raska had broken up with her boyfriend, Murphy proposed that they take a vacation alone together. Raska rejected this offer and acted like Murphy was joking.

72.     Afterwards, Raska continued sending Murphy his daily schedule and picking up his son from school, but she stopped coming into the office in person in an effort to avoid being physically assaulted and groped by Murphy.

73.     Murphy made it impossible for Raska to continue her employment without acquiescing to Murphy's sexual demands.

74.     Murphy tried to convince her to come back to work in person. "All you gotta do is sit at a desk all day. I'm giving you this opportunity. I know you have a daughter. Nobody else is gonna give you these opportunities."  Raska told him she did executive assistant work for years. She asked him why he took her away from her prior work in real estate and promoting just so she could sit at a desk. Murphy said, "Well, that was ghetto shit." Raska told him that it was completely professional and the supposedly "ghetto" Detroit rappers treated her with respect.

75.     In early May, after a miscommunication with Murphy's son about his schedule, Murphy called Raska and started screaming and cussing at her. Feeling

the pressure of months of sexual harassment, Raska told Murphy, "I can't do this anymore." She told him she was under too much pressure.

76.    The next day, Murphy told Raska to take the rest of the week off and come back to work the following Monday.  After the short leave, Raska returned to the office as planned.

77.    On Tuesday, May 10, 2022, Raska met with Murphy. This was the last time Raska saw Murphy in person. That day, she begged him to give her something to do. He refused to give her real work. Murphy told Raska that it did not make sense for her to stick around. He told her June 3rd would be her last day and that she should not worry about coming into the office until then.

78.    Immediately after that conversation, Murphy emailed Nicolet Lewis in HR and falsely stated that Raska had resigned by choice.

79.    Murphy hired Raska to be his executive assistant but never allowed her to perform that role. Murphy terminated Raska's employment because she refused to have a sexual relationship with him, in retaliation for her objecting to his conduct and because she refused to perform historically feminine caregiving tasks that were outside the scope of her professional employment.

80.    Murphy's behavior continued to be erratic and unpredictable. The very next day, he asked Raska to come into the office to help with some mailing. He had just told her the day before that she did not need to come into the office anymore. Raska was concerned that this was another effort by Murphy to lure her into the office so that he had physical access to harass her.

81.     Raska stopped responding to Murphy's text messages. Murphy began calling her repeatedly. When Raska heard from colleagues that Murphy was considering sending the police to her house, she texted him that she was okay. This was her last text message to Murphy.

82.     Murphy continued calling her two or three times a day.  He texted every few days. Raska did not respond.

83.     At the end of May, HR arranged for Raska to return her work laptop and phone.

84.     Even after Raska's employment with the Pistons was fully concluded, Murphy continued to call and text her periodically. She did not respond.

85.     On August 2, 2022, Murphy texted Raska a link to a news article: "Rob Murphy now Pistons Assistant GM." Raska did not respond.

86.     Murphy upended Raska's plans to work in professional basketball and the career she had building as a manager for amateur players.

87.     Several months after she left the Pistons, in August 2022, Raska reported Murphy's conduct Pistons HR and their legal counsel.

88.     The Pistons conducted an internal investigation. Raska was interviewed by Pistons legal counsel in October 2022. She offered to sit for a lie detector test, but the Pistons declined. Raska provided a detailed timeline and names of witnesses that she told about the harassment.

89.     The Pistons retained Murphy with the Organization and took no further action for over six months until they received notice of the risk of this lawsuit.

90.    As a result of the sexual harassment, assault, and discrimination committed by Murphy and sanctioned by the Pistons Organization, Raska has suffered damages including and not limited to: lost wages and other economic advantages of employment, mental anguish, humiliation, embarrassment, emotional distress, and lost professional opportunities.

91.    On January 19, 2023, Raska filed a charge of discrimination and request to investigate with the Equal Employment Opportunity Commission.

92.    On May 4, 2023, Raska filed suit against Defendants in the Circuit Court for the County of Wayne asserting violations of ELCRA, assault, and battery.

93.    On November 2, 2023, the EEOC issued a Right to Sue letter for Raska's claims under Title VII of the Civil Rights Act.

### COUNT I
### SEXUALLY HOSTILE WORK ENVIRONMENT
### IN VIOLATION OF TITLE VII
### Plaintiff v. The Pistons and Murphy

94.    Plaintiff Raska incorporates the above allegations as if stated in full herein.

95.    Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating in the terms and conditions of employment on the basis of sex or gender, including discrimination through a sexually hostile work environment. 42 U.S.C. 2000e et seq.

96.    At all relevant times, Plaintiff was an employee and Defendants were employers within the meaning of 42 USC §2000e.

97.    At all relevant times, both Defendants had the authority to alter the conditions of Raska's employment. Accordingly, Murphy was an agent of the employer

within the meaning of 42 USC §2000e.

98.     At all relevant times, Plaintiff had a legally enforceable right to be treated equally in her employment and was entitled to protection under Title VII. This right included the right to be free from severe and pervasive harassment of a sexual nature that created a hostile working environment.

99.     Notwithstanding the duties set forth above, Defendants violated Title VII by subjecting Raska to quid pro quo sexual harassment and subjecting her to a severe, pervasive offensive, and hostile environment on the basis of sex, culminating in her constructive discharge.

100.    The acts of sexual harassment to which Plaintiff was subjected were severe and pervasive and created a hostile, intimidating and offensive work environment that materially altered the terms and conditions of Plaintiff's employment.

101.    Plaintiff repeatedly complained to Defendant Murphy that his illegal conduct and communication was unwelcome and yet he continued to subject Plaintiff to sexual harassment.

102.    Murphy conditioned Raska's work assignments on explicit requests for sex and retaliated when she refused by withholding the job duties and opportunities that she had been hired for.

103.    Raska repeatedly indicated to Murphy that his conduct was unwelcome by a range of methods, including and not limited to: explicitly telling Murphy not to touch her; explicitly telling Murphy that she was not interested in a sexual relationship; redirecting the conversation to other topics; leaving the area when Murphy began to harass her; and

working remotely when possible to avoid being in the same room with Murphy.

104.   The Pistons had actual and/or constructive notice of Murphy' harassing behavior of women at the Pistons, including Raska, but failed to take prompt and adequate remedial action in response and, as a result, the harassment continued and created a sexually hostile work environment for Raska.

105.   These unlawful employment practices as described above were done with malice or reckless indifference to the federally protected rights of Plaintiff.

106.   As a result, Plaintiff has suffered damages and injuries as alleged above.

<u>COUNT II</u>

SEX DISCRIMINATION IN VIOLATION OF TITLE VII

**Plaintiff v. The Pistons and Murphy**

107.   Plaintiff Raska incorporates the above allegations as if stated in full herein.

108.   Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating in the terms and conditions of employment on the basis of sex or gender. 42 U.S.C. 2000e et seq.

109.   At all relevant times, Plaintiff was an employee and Defendants were employers within the meaning of 42 USC §2000e.

110.   At all relevant times, both Defendants had the authority to alter the conditions of Raska's employment. Accordingly, Murphy was an agent of the employer within the meaning of 42 USC §2000e.

111.   At all times material hereto, Plaintiff had a legally enforceable right to be treated equally in her employment and was entitled to protection under Title VII.

112.   Notwithstanding the duties set forth above, Defendants violated Title VII by (a)

requiring her to perform historically feminine caregiving tasks that were outside the scope of her professional employment and (b) subjecting Plaintiff to severe and pervasive sexual harassment based on her gender, culminating in her constructive discharge.

113.    This unequal treatment materially altered the terms and conditions of Plaintiff's employment.

114.    Plaintiff repeatedly complained to Defendant Murphy that she had been hired to perform an executive assistant role, but Murphy refused to allow her to perform the standard duties of this role and instead continued to require her to perform historically feminine caregiving tasks and subjected Plaintiff to ongoing sexual harassment.

115.    Murphy conditioned Raska's work assignments on explicit requests for sex and retaliated when she refused by withholding the job duties and opportunities that she had been hired for.

116.    The Pistons had actual and/or constructive notice of Murphy's sexual harassment of Raska and sexually discriminatory job assignments, but failed to take prompt and adequate remedial action in response and, as a result, the harassment continued and created a sexually hostile work environment for Raska.

117.    These unlawful employment practices as described above were done with malice or reckless indifference to the federally protected rights of Plaintiff.

118.    As a result, Plaintiff has suffered damages and injuries as alleged above.

<u>COUNT III</u>

RETALIATION IN VIOLATION OF TITLE VII

**Plaintiff v. The Pistons and Murphy**

119.    Plaintiff Raska incorporates the above allegations as if stated in full herein.

120.   At all relevant times, Plaintiff was an employee and Defendants were employers within the meaning of 42 USC §2000e.

121.   At all relevant times, both Defendants had the authority to alter the conditions of Raska's employment. Accordingly, Murphy was an agent of the employer within the meaning of 42 USC §2000e.

122.   At all times material hereto, Plaintiff had a legally enforceable right to be treated equally in her employment and was entitled to protection under Title VII.

123.   Under Title VII, Defendants had a legal duty not to retaliate against Plaintiff because of reports of sex harassment or opposing the violation of her rights.

124.   Plaintiff repeatedly objected to the ongoing sexual harassment by Murphy and complained to Murphy that she had been hired to perform an executive assistant role.

125.   Notwithstanding the legal duties set forth above, Defendants retaliated against Raska for complaining about the violation of her rights in the form of further harassment, lost wages, altered terms and conditions of employment, and constructive discharge.

126.   Murphy conditioned Raska's work assignments on explicit requests for sex and retaliated when she refused by withholding the job duties and opportunities that she had been hired for.

127.   As a result, Plaintiff has suffered damages and injuries as alleged above.

## COUNT IV

## SEXUAL HARASSMENT IN VIOLATION OF THE
## ELLIOTT-LARSEN CIVIL RIGHTS ACT
### Plaintiff v. The Pistons and Murphy

128. Raska incorporates the allegations above as though set forth fully herein.

129. Defendants violated ELCRA by subjecting Raska to quid pro quo sexual harassment and subjecting her to an offensive and hostile environment on the basis of sex.

130. Raska was an employee of the Detroit Pistons Organization within the terms of Michigan's Elliott-Larsen Civil Rights Act (ELCRA), MCL §37.2101, et seq.

131. Murphy was an employee and an agent of the Detroit Pistons Organization within the terms of Michigan's Elliott-Larsen Civil Rights Act (ELCRA), MCL §37.2101, et seq. Murphy had the authority and ability to alter the terms and conditions of Raska's employment.

132. Under ELCRA, the Pistons and Murphy had a duty to Raska not to harass her with respect to her employment, compensation, or terms, conditions, or privileges of employment because of Raska' sex; or to limit, segregate, or classify Raska for employment in any way which deprived or tended to deprive Raska of employment opportunities, or otherwise adversely affect the status of Raska' employment because of her sex.

133. Murphy and the Pistons further had a duty under the ELCRA not to subject Raska to unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct or communication of a sexual nature, when such conduct or communication has a purpose or effect of substantially interfering with an individual's employment, or creating an intimidating, hostile, or offensive employment environment; or when submission to or

rejection of such conduct or communication by an individual is used as a factor in decisions affecting such individual's employment. MCL §37.2103(h)(ii)(iii).

134.    The Pistons also had a duty under the ELCRA to investigate and take prompt and adequate remedial action in response to any complaints of sexual harassment.

135.    Notwithstanding said duties, and in willful violation thereof, the Pistons and Murphy subjected Raska to sexual harassment in the following ways, as detailed more fully in the Statement of Facts of this Complaint, including and not limited to:

   a.   Subjecting Raska to verbal and sexual harassment, innuendo, humiliation, and retaliation because of her sex;

   b.   Subjecting Raska to sexual assault, including unwelcome and unwanted groping and touching of her breasts, groin, and buttocks, and attempting to rape her;

   c.   Conditioning Raska's job opportunities on performing sexual favors for Murphy;

   d.   Subjecting Raska to conduct and communication, the purpose and/or effect of which was to substantially interfere with Raska' employment and/or create an intimidating, hostile and offensive employment environment for Raska because of her sex;

   e.   Terminating Raska because she continued to refuse to engage in sex with Murphy.

136.    Raska repeatedly indicated to Murphy that his conduct was unwelcome by a range of methods, including and not limited to: explicitly telling Murphy not to touch her; explicitly telling Murphy that she was not interested in a sexual relationship; redirecting the conversation to other topics; leaving the area when Murphy began to harass her; and working remotely when possible to avoid being in the same room with Murphy.

137. The Pistons had actual and/or constructive notice of Murphy' harassing behavior of women at the Pistons, including Raska, but failed to take prompt and adequate remedial action in response and, as a result, the harassment continued and created a sexually hostile work environment for Raska.

138. As a result, Plaintiff has suffered damages and injuries as alleged above.

COUNT V

**SEX DISCRIMINATION IN VIOLATION OF THE
ELLIOTT-LARSEN CIVIL RIGHTS ACT**
**Plaintiff v. The Pistons and Murphy**

139. Plaintiff Raska incorporates the above allegations as if stated in full herein.

140. Raska was an employee of the Detroit Pistons Organization within the terms of Michigan's Elliott-Larsen Civil Rights Act (ELCRA), MCL §37.2101, et seq.

141. Murphy was an employee and an agent of the Detroit Pistons Organization within the terms of Michigan's Elliott-Larsen Civil Rights Act (ELCRA), MCL §37.2101, et seq. Murphy had the authority and ability to alter the terms and conditions of Raska's employment.

142. Under ELCRA, the Pistons and Murphy had a duty to Raska not to harass her with respect to her employment, compensation, or terms, conditions, or privileges of employment because of Raska' sex; or to limit, segregate, or classify Raska for employment in any way which deprived or tended to deprive Raska of employment opportunities, or otherwise adversely affect the status of Raska' employment because of her sex.

143. Notwithstanding the duties set forth above, Defendants violated ELCRA by (a) requiring her to perform historically feminine caregiving tasks that were outside the scope of

her professional employment and (b) subjecting Plaintiff to severe and pervasive sexual harassment based on her gender, culminating in her constructive discharge.

144. This unequal treatment materially altered the terms and conditions of Plaintiff's employment.

145. Plaintiff repeatedly complained to Defendant Murphy that she had been hired to perform an executive assistant role, but Murphy refused to allow her to perform the standard duties of this role and instead continued to require her to perform historically feminine caregiving tasks and subjected Plaintiff to ongoing sexual harassment.

146. Murphy conditioned Raska's work assignments on explicit requests for sex and retaliated when she refused by withholding the job duties and opportunities that she had been hired for.

147. The Pistons had actual and/or constructive notice of Murphy's sexual harassment of Raska and sexually discriminatory job assignments, but failed to take prompt and adequate remedial action in response and, as a result, the harassment continued and created a sexually hostile work environment for Raska.

148. These unlawful employment practices were done with malice or reckless indifference to the federally protected rights of Plaintiff.

149. As a result, Plaintiff has suffered damages and injuries as alleged above.

## COUNT VI

## RETALIATION IN VIOLATION OF THE
## ELLIOTT-LARSEN CIVIL RIGHTS ACT
### Plaintiff v. The Pistons and Murphy

150.    Raska incorporates the allegations above as though set forth fully herein.

151.    At all times relevant to this action, the Elliott-Larsen Civil Rights Act ("ELCRA") prohibited Defendants from retaliating against Raska for opposing sexual harassment prohibited under the Act.

152.    Raska was an employee of the Detroit Pistons Organization within the terms of Michigan's Elliott-Larsen Civil Rights Act (ELCRA), MCL §37.2101, et seq.

153.    Murphy was an employee and an agent of the Detroit Pistons Organization within the terms of Michigan's Elliott-Larsen Civil Rights Act (ELCRA), MCL §37.2101, et seq. Murphy had the authority and ability to alter the terms and conditions of Raska's employment.

154.    Raska opposed Murphy's sexual harassment by verbally repudiating his harassment and refusing to comply with his sexual advances.

155.    Murphy and the Pistons restricted Raska's job duties and professional opportunities in retaliation for her opposition to unlawful sex harassment prohibited under ELCRA.

156.    In violation of that duty, Murphy and the Pistons constructively discharged and then formally terminated Raska's employment in retaliation for her opposition to unlawful sex harassment prohibited under ELCRA.

157.    The reasons provided for Raska's termination were pretext for unlawful

retaliation.

158.    Plaintiff has suffered damages and injuries as alleged above.

## COUNT VII
## BATTERY
### Plaintiff v. Murphy

159.    Raska incorporates the allegations above as though set forth fully herein.

160.    Defendant Rob Murphy battered Plaintiff Raska throughout her employment by intentional, unconsented, and harmful or offensive touching, including and not limited to the following unwanted physical and sexual touching, all committed without her consent:

    a.  Groping Raska's breasts and behind on multiple occasions at the Pistons Practice Facility as detailed above;

    b.  Grabbing Raska's breasts and genitals on multiple occasions at his home as detailed above;

    c.  Pushing her onto a bed and holding her down as he pressured her to engage in unwanted sex in or around January 2022;

    d.  Groping Raska's body in public when she gave him a ride to pick up his car from a car detail shop in or around April 2022;

161.    Murphy intended to commit unconsented and harmful or offensive touching because he persisted and indeed escalated his physical and sexual touching despite Ms. Raska's repeated and consistent objections to his conduct.

162.    Plaintiff has suffered damages and injuries as alleged above.

## COUNT VIII

### ASSAULT

### Plaintiff v. Murphy

163.   Raska incorporates the allegations above as though set forth fully herein.

164.   Defendant Rob Murphy assaulted Plaintiff Raska throughout her employment by intentionally and unlawfully offering physical injury toward Ms. Raska's person and by threatening, offering, and committing unwanted, offensive touching, coupled with clear present ability to accomplish physical contact, including and not limited to the following acts of battery, all committed without her consent:

   a. Groping Raska's breasts and behind on multiple occasions at the Pistons Practice Facility as detailed above;

   b. Grabbing Raska's breasts and genitals on multiple occasions at his home as detailed above;

   c. Asking Raska to "suck [my] dick" while they were alone in a car in or around November 2021;

   d. Pushing her onto a bed and holding her down as he pressured her to engage in unwanted sex in or around January 2022;

   e. Groping Raska's body in public when she gave him a ride to pick up his car from a car detail shop in or around April 2022;

165.   Murphy's verbal and sexual harassment and acts of battery created a well-founded apprehension of imminent contact for Raska, causing her to reasonably fear that he would commit further acts of assault, battery, and harassment.

166.   Murphy specifically intended to commit an assault because he persisted and indeed escalated his unwanted physical and sexual touching, verbal harassment, and

other sexual harassment that created a well-founded apprehension of injury and further battery, despite Ms. Raska's repeated and consistent objections to his conduct.

167.    Every battery Murphy committed against Raska "necessarily includes an assault because a battery is the very consummation of the assault." *Lakin v. Rund*, 318 Mich. App. 127, 131; 896 N.W.2d 76 (2016).

168.    Plaintiff has suffered damages and injuries as alleged above.

### Request for Relief

169.    Plaintiff has suffered the damages and injuries as alleged above. Accordingly, Plaintiff requests the following relief:

    a.  An order awarding her all compensatory damages, including economic and emotional damages, past and future, in an amount she is found to be entitled to;

    b.  An order awarding her all punitive and liquidated damages in an amount she is found to be entitled to;

    c.  An order awarding her all costs, interest, expenses, and attorney fees in an amount she is found to be entitled to;

    d.  An order granting her all such other relief as the court deems just and equitable.

Respectfully submitted,

Pitt McGehee Palmer Bonanni & Rivers, P.C.

By:   *s/ Megan A. Bonanni*
Megan A. Bonanni (P52079)
Danielle Y. Canepa (P82237)
Michael L. Pitt (P24429)
117 W. Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800

mbonanni@pittlawpc.com
dcanepa@pittlawpc.com
mpitt@pittlawpc.com


Dated: January 26, 2024

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEJANAI RASKA,

     Plaintiff,                    Case No.
                                 Hon.

v.

DETROIT PISTONS ORGANIZATION
and ROBERT MURPHY,
jointly and severally,

     Defendants.

---

PITT MCGEHEE PALMER BONANNI & RIVERS, P.C.
Megan A. Bonanni (P52079)
Danielle Y. Canepa (P82237)
Michael L. Pitt (P24429)
117 W. Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800
mbonanni@pittlawpc.com
dcanepa@pittlawpc.com
mpitt@pittlawpc.com

---

## DEMAND FOR JURY TRIAL

     Plaintiff DeJanai Raska demands a trial by jury of all issues within the causes of action.

                    Respectfully submitted,

                    Pitt McGehee Palmer Bonanni & Rivers, P.C.

                    By:  *s/ Megan A. Bonanni*
                    Megan A. Bonanni (P52079)
                    Danielle Y. Canepa (P82237)
                    Michael L. Pitt (P24429)

117 W. Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800
mbonanni@pittlawpc.com
dcanepa@pittlawpc.com
mpitt@pittlawpc.com

Dated: January 26, 2024